# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ROGER GOLDINGAY**,<br><br>        Plaintiff,<br><br>    v.<br><br>**PROGRESSIVE CASUALTY INSURANCE COMPANY and CHEVRON U.S.A. INC.**,<br><br>        Defendants. | Case No. 3:17-cv-1491-SI (Lead Case)<br><br>Case No. 3:17-cv-1494-SI (Trailing Case)<br><br>**OPINION AND ORDER** |
| **CAROL OTIS**,<br><br>        Plaintiff,<br><br>    v.<br><br>**PROGRESSIVE CASUALTY INSURANCE COMPANY and CHEVRON U.S.A. INC.**,<br><br>        Defendants. | |

Brooks M. Foster, CHENOWETH LAW GROUP, PC, 510 SW Fifth Avenue, Fifth Floor, Portland, OR 97204. Of Attorney for Plaintiffs.

J. Matthew Donohue and Kristin M. Asai, HOLLAND & KNIGHT LLP, 2300 US Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Defendant Progressive Casualty Insurance Company.

David A. Bledsoe and Julie A. Wilson-McNerney, PERKINS COIE LLP, 1120 NW Couch Street, Tenth Floor, Portland, OR 97209. Of Attorneys for Defendant Chevron U.S.A. Inc.

**Michael H. Simon, District Judge.**

Plaintiffs Roger Goldingay ("Goldingay") and Carol Otis ("Otis") (collectively, "Plaintiffs") are husband and wife. They each filed their own lawsuit in state court against Defendants Progressive Casualty Insurance Company ("Progressive") and Chevron U.S.A Inc. ("Chevron") (collectively, "Defendants"). Based on substantially identical factual allegations, Goldingay and Otis assert substantially identical legal claims based exclusively on state law. Defendants timely removed the two lawsuits to federal court, and the Court consolidated these actions. On January 25, 2018, the Court issued an Opinion and Order (ECF 30), dismissing without prejudice many of Plaintiffs' claims, including their request for declaratory judgment regarding future remedial action costs. On February 8, 2018, Plaintiffs filed an Amended Complaint in which they repleaded their request for declaratory judgment. Progressive and Chevron now move for partial judgment on the pleadings against Plaintiffs' request for declaratory judgment regarding future remedial action costs. For the reasons that follow, Defendants' motion is granted.

## STANDARDS

Under Rule 12(c) of the Federal Rules of Civil Procedure, a "motion for judgment on the pleadings faces the same test as a motion under Rule 12(b)(6)." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988)). In addition, "to survive a motion to dismiss, a complaint must contain sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also*

*Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (*Iqbal* standard applies to review of Rule 12(c) motions).

## BACKGROUND

Plaintiffs Goldingay and Otis are a married couple. In 2010, Plaintiffs purchased real property located at 8145 SE 82nd Avenue in Portland, Oregon. The parties refer to that property as "Cartlandia," or the "Cartlandia Property," because a variety of food carts are situated on the site. In 2005, Defendant Progressive purchased real property (the "Progressive Property") that is northwest and uphill from the Cartlandia Property. At some point in time, Defendant Chevron, or its predecessor, Standard Oil Co. Inc. ("Standard"), previously owned the Progressive Property. From approximately 1936 to 1955, Chevron (or Standard) allegedly operated a petroleum bulk plant on the Progressive Property. Neither Chevron nor Standard is the current owner or operator of the Progressive Property. The City of Portland owns a narrow public right-of-way (the "Springwater Corridor"), which lies between the Cartlandia Property and the Progressive Property.

After purchasing the Cartlandia Property, Plaintiffs hired Evergreen Environmental Management, LLC ("Evergreen") to perform an environmental assessment of the Cartlandia Property. Evergreen identified the presence of petroleum contamination in the groundwater. Evergreen opines that at least some of the contamination on Plaintiffs' Cartlandia Property likely came from the petroleum bulk plant that Chevron or Standard previously operated on the Progressive Property, which is uphill from the Cartlandia Property. As part of its work for Plaintiffs, Evergreen obtained water samples from the Springwater Corridor. These samples show concentrations of petroleum in the groundwater in the Springwater Corridor that is only a few feet away from Progressive's property line. Groundwater in the area flows from the

Progressive Property through the Springwater Corridor and across the Cartlandia Property on its way to a nearby creek.

Plaintiffs have incurred costs for Evergreen's environmental consulting, sampling, and laboratory analyses. Plaintiffs have demanded that Progressive and Chevron reimburse Plaintiffs for these costs. Both Progressive and Chevron declined. These costs are not at issue in the pending motion.

On July 17, 2017, the Oregon Department of Environmental Quality ("DEQ") sent a letter to Progressive that identified both Progressive and Chevron as potentially responsible parties for the contamination found on the Progressive Property. ECF 58-1. In its letter, DEQ explained that the Progressive Property has been listed in the DEQ's Environmental Cleanup Site Information Database ("ECSI Database"). The Cartlandia Property, however, is not currently listed in the ECSI Database.

In response to an earlier motion, the Court dismissed Plaintiffs' claims for declaratory judgment. The Court found that Plaintiffs had not plausibly alleged that the Cartlandia Property was likely to undergo DEQ-approved or DEQ-required remedial action because the Cartlandia Property was not a source of contamination. On January 31, 2018, after the Court dismissed Plaintiffs' claims, DEQ sent a letter to Plaintiffs informing them that "[t]he DEQ will NOT be requesting Cartlandia to do any further work or remedial action on a contaminant plume originating from an off-site source, but rather would seek to identify the source and have the property owner (or former owners) perform that work." ECF 59-1 (capitalization in original).

On May 22, 2018, DEQ sent a letter to Progressive, stating that DEQ considers remedial action on the Progressive Property to be a high priority, and that the remedial action will include delineation of the contamination on the Progressive Property and other affected sites. ECF 58-6.

PAGE 4 – OPINION AND ORDER

DEQ's letter also stated that if Progressive did not enter into a voluntary cleanup program within 30 days, DEQ would initiate negotiations for an enforcement order. The letter added that DEQ could issue a unilateral enforcement order, if Progressive did not participate in those negotiations.

Plaintiffs have repleaded their claim for declaratory judgment, asserting new allegations that: (1) "DEQ deems a 'remedial investigation' of the [Progressive] facility to be necessary pursuant to OAR 340-122-0080 to develop information to determine the need for remedial action;" (2) "DEQ and its applicable regulations have required work in the past and will require work in the future to investigate, delineate, assess, evaluate, remove, and/or remediate the contamination associated with the facility so as to obtain a no further action letter ("NFA") or equivalent site closure certification letter from DEQ. The facility encompasses areas of both the Progressive Property and the Cartlandia Property;" and (3) "DEQ has [] confirmed that, more likely than not, the removal or remedial action required to obtain an NFA or equivalent site closure certification from DEQ for the facility will require significant removal or remedial action at the Cartlandia Property including, without limitation: (i) data collection from groundwater monitoring wells . . . (ii) treatment and/or methods of active remediation to reduce the concentrations of hazardous substances in the groundwater at the Cartlandia Property; and (iii) quarterly groundwater monitoring. . . ." ECF 31.

## DISCUSSION

Under ORS § 465.257, any party potentially liable under ORS § 465.255 for contamination that incurs remedial action costs for the cleanup of a hazardous release may seek contribution from any other party potentially liable under ORS § 465.255. Pursuant to this statute, Plaintiffs seek a declaration that Defendants are liable to Plaintiffs for all future remedial action costs associated with the contamination at the Cartlandia Property.

PAGE 5 – OPINION AND ORDER

To state a claim for declaratory judgment in federal court, a plaintiff must establish Article III standing. Standing to seek declaratory relief requires that there "be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of a present right upon established fact.'" *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 242 (1937)). Declaratory relief is appropriate when "the facts alleged, under all circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Ed Niemi Oil Co., Inc. v. Exxon Mobil Corp.*, 2013 WL 957007, *11 (D. Or., March 11, 2013) (quoting *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1192 (9th Cir. 2000).

To establish standing for declaratory relief under ORS § 465.257, a plaintiff must allege facts sufficient to show, among other things, that DEQ is likely to undertake, require, or oversee remedial action. Private parties cannot independently undertake "remedial action" for the purpose of obtaining the benefits of that statute. Rather, "for 'remedial action' to exist, the State must undertake, require, or oversee the action." *McDonald v. Sun Oil Co.* 548 F.3d 774, 778-85 (9th Cir. 2008), r*ev'd on other grounds by CTS Corp. v. Waldburger*, 124 S. Ct. 2175 (2014). Moreover, a plaintiff must allege facts sufficient to establish that he or she is likely to incur those DEQ-related costs. *See* ORS § 465.255(1) ("[t]he following persons shall be strictly liable for those remedial action costs *incurred by* the state or any other person" (emphasis added)).

Defendants argue that Plaintiffs lack standing for declaratory relief at this time because they have not sufficiently alleged a likelihood that they will incur "remedial action costs" within the meaning of ORS § 465.255. Defendants assume, for purposes of this motion, that DEQ may require Progressive to remediate the Progressive Property and to delineate the contamination in

groundwater at the Progressive Property, the Cartlandia Property, and other affected sites. Defendants argue, however, that DEQ has stated that Plaintiffs will not be ordered to perform any of the future remedial action on the Cartlandia Property. Thus, according to Defendants, Plaintiffs do not have standing because it will be Progressive—and not Plaintiffs— that will incur any future remedial action costs. Plaintiffs respond that although Progressive may initially be ordered to perform the remedial actions, Progressive may prove uncooperative and force Plaintiffs to perform the remedial actions instead. Plaintiff further respond that even if Progressive does perform DEQ-ordered remedial actions, Plaintiffs may still incur remedial action costs in negotiating an access agreement, supervising Progressive's work, and approving conditions for the temporary closure of the Cartlandia Property.

**A. Likelihood of DEQ Requiring Plaintiffs to Perform Remedial Action**

DEQ has stated that it will not require Plaintiffs to perform remedial action. An email from DEQ to Plaintiff Otis states that "DEQ will NOT be requesting Cartlandia to do any further work or remedial action on a contamination plume originating from an off-site source, but rather would seek to identify the source and have the property owner (or former owners) perform that work." ECF 59-1 (capitalization in original).

Plaintiffs respond that, although they may not be ordered to perform remedial action initially, they may in the future be ordered or approved to perform remedial action if Progressive does not cooperate with DEQ's orders. Moreover, Plaintiffs argue that Progressive is likely to be uncooperative because it has "proven recalcitrant and [has] never lifted a finger to investigate or remediate the plume on the Cartlandia Property." Plaintiffs' argument, however, is speculative and insufficient to permit declaratory judgment standing. That Progressive has not yet taken remedial action does not mean that it will not cooperate with DEQ's future orders. Moreover, on May 22, 2018, DEQ sent a letter to Progressive, stating that if Progressive does not enter into a

PAGE 7 – OPINION AND ORDER

voluntary cleanup program within 30 days, DEQ would contact Progressive to "initiate negotiations on terms of an enforcement order." It is too early to conclude that Progressive is unlikely to comply with an enforcement order that has not yet been developed. Finally, there is no reason to assume that, even if Progressive were to resist the enforcement order, DEQ would then direct *Plaintiffs* to perform the remedial action that Progressive refused to undertake.[1]

**B. Plaintiffs' Costs Arising from Defendants' Remedial Actions**

Plaintiffs also assert that, even if Progressive does comply with DEQ's directive to undertake remedial action, Plaintiffs nevertheless will incur "remedial action costs" associated with Defendants' future remedial actions. Specifically, Plaintiffs state that they likely will incur remedial action costs by: (1) negotiating an access agreement, which will require legal representation; (2) supervising and examining Defendants' remedial and removal actions, which will require hiring an environmental consultant; and (3) approving conditions of site closure, which also will require legal representation.

**1. Definition of "remedial action costs"**

"'Remedial action costs' means reasonable costs that are attributable to or associated with a removal or remedial action at a facility, including but not limited to the costs of administration, investigation, legal or enforcement activities, contracts and health studies." ORS 465.200(24). "Remedial action" pertains only to the *actual physical process or processes* intended to remedy

---

[1] It is also possible that after Progressive fully performs the remedial action that DEQ orders, Plaintiffs may still be unable to obtain an NFA. If that were to occur, Plaintiffs might then be approved for DEQ's voluntary cleanup program and thus themselves be allowed to perform "remedial action." That series of events, however, is speculative and insufficient to establish standing for Plaintiffs' declaratory judgment action. *See Ed Niemi Oil*, 2013 WL 957007 at *11 (holding that, when an NFA had been issued declaring that future remedial action would be necessary only if "new or undisclosed facts show that the cleanup does not comply with referenced rules," the need for future remedial action was speculative and insufficient to establish standing in a declaratory judgment action).

contamination. *Cash Flow Investors, Inc. v. Union Oil Co. of California*, 318 Or. 88, 93 (1993). Thus, the term "remedial action costs" refers "only to those costs . . . attributable to or associated with the carrying out of those physical processes." *Id*. For example, costs incurred in a legal proceeding to seek compensation for remedial action costs under ORS § 465.257 are not recoverable because those costs are not associated with the physical remedial processes. *Id.*

According to the Oregon Court of Appeals, however, attorney fees incurred in an action to compel a landowner to allow access to his or her property constitute remedial action costs because those costs are incurred in "an action by which [the plaintiff] attempted to complete the actual physical process." *DEQ v. Baney Corp.*, 153 Or. App 289, 293 (1998). In *Baney*, DEQ sued a landowner for an injunction granting DEQ access to the landowner's property in order to monitor the extent of a release from a neighboring property, and then sought contribution for its attorney fees from the landowner under ORS § 465.257. *Id.* at 292. Although the landowner's property was only affected by and not the source of the release, the Court of Appeals held that the landowner was liable for DEQ's attorney fees because: (1) the landowner was a liable party under ORS § 255(1)(e) for unlawfully hindering the remedial action by blocking DEQ from the property for monitoring purposes; and (2) the attorney fees were remedial action costs because they were necessary to complete the release monitoring, which the evidence showed was a necessary component of the remedial action. *Id.* at 293.

### 2. Costs incurred in negotiating access agreement

Even assuming that the future access agreement negotiation costs that Plaintiffs identify could reasonably be considered "remedial action costs" within the meaning of the statute, such costs are speculative at this time and insufficient to establish standing. Plaintiffs allege in their Amended Complaint that DEQ likely will need to access Plaintiffs' property to treat and monitor the groundwater. ECF 31. Plaintiffs argue that "DEQ has not expressly stated that remedial work

PAGE 9 – OPINION AND ORDER

at [Plaintiffs'] Property is not required." DEQ has informed Progressive that the required remedial actions on the Progressive property "include delineation of the contamination in groundwater at [the Progressive] site *and other properties*." ECF 58-6 (emphasis added). Thus, there is a reasonable possibility that some incursion onto the Cartlandia Property will be necessary for Progressive to carry out the remedial action. It is not clear, however, how invasive or extensive that access will be. Progressive, for example, may be able to delineate the contamination without accessing Plaintiffs' property—or with only very minimal access—because Plaintiffs' consulting expert, Evergreen, has already gathered onsite data that Progressive may use to delineate the contamination. If, however, the consent agreement or unilateral enforcement order from DEQ requires Progressive significantly to intrude upon the Cartlandia Property over an extended period of time, the legal fees associated with reaching such an access agreement may be a reasonable cost associated with that remedial action plan. Because ORS § 465.200 defines remedial action costs as "reasonable costs" associated with remedial action, and a "reasonableness" determination is nearly impossible to make in advance and in the abstract, both the uncertainty and the hypothetical nature of these costs is insufficient to confer standing upon Plaintiffs at this time for a declaratory judgment.

Moreover, under ORS § 250(3) and *Baney*, Plaintiffs have a legal obligation to permit the party conducting remedial action—whether Progressive or DEQ—to enter their property to monitor the release, if DEQ deems such monitoring necessary to complete the remedial action. Further, Plaintiffs themselves may be liable for legal fees associated with a legal action that arises from Plaintiffs' refusal reasonably to grant access. ORS § 250(3); *Baney*, 153 Or.App at 293. Nevertheless, because DEQ has not yet issued an enforcement order nor entered into a

consent agreement with Progressive, the actual costs that Plaintiffs may incur and the reasonableness of those potential costs are speculative.

### 3. Costs incurred in supervising or evaluating remedial work

Costs that Plaintiffs may incur in the future in supervising or evaluating Progressive's remedial actions also do not constitute recoverable "remedial action costs." DEQ is responsible for ensuring that Progressive's remedial actions comply with any eventual consent or enforcement order. Additional supervision or evaluation is likely to be unnecessary, and if Plaintiffs choose to supervise or evaluate Progressive's work, the costs that Plaintiffs incur will be voluntary and thus unrecoverable in a statutory contribution proceeding.

### 4. Costs incurred in negotiating or approving temporary site closure

Plaintiffs also do not allege facts sufficient to show that they likely will need to close the Cartlandia Property during remediation. The mere possibility that they may need to do so for some period of time is speculative and thus insufficient to establish standing at this time.

## CONCLUSION

Defendant Chevron U.S.A. Inc.'s Motion for Partial Judgment on the Pleadings (ECF 55), joined by Defendant Progressive Casualty Insurance Company (ECF 56), is GRANTED.

**IT IS SO ORDERED**.

DATED this 3rd day of August, 2018.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge